UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

SHERRY HOUCK PHILEN        *      CIVIL ACTION NO.  11-1609

VERSUS                  *      JUDGE ROBERT G. JAMES

HARTFORD LIFE & ACCIDENT     *      MAG. JUDGE KAREN L. HAYES
INSURANCE CO., ET AL.

REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are cross-

motions for summary judgment filed by Plaintiff Sherry Houck Philen [doc. # 35] and Defendant

Hartford Life & Accident Insurance Co. ("Hartford") [doc.  # 42].  For reasons explained below,

it is recommended that Plaintiff's motion be denied, and that Hartford's motion be granted.

On September 5, 2011, Sherry Houck Philen filed the instant complaint under the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*., against

Hartford, the designated plan fiduciary and the administrator of the employee welfare benefit

plan ("the Plan" or "the Policy") sponsored by Philen's former employer, Kilpatrick Life

Insurance Company. [doc. # 1, P. 2].  Plaintiff contends that Hartford wrongfully denied her

disability benefits under the Plan.  *See* [doc. # 1].  Accordingly, she seeks a judgment ordering

Hartford to pay her disability benefits under the Plan, plus attorney's fees.  *Id*. at 20.

Following the resolution of Plaintiff's motion for summary judgment regarding the

standard of review to be applied in this case,[1] the Court set a briefing schedule for submission of

the matter for decision on the administrative record.  [doc. # 34].  Instead, however, the parties

_____

[1]  *See* discussion, *infra*.

submitted the matter for decision in the context of cross-motions for summary judgment [doc. #s 35 & 42], thereby effectively conceding that there are no genuine issues of material fact. Following delays for responsive briefs, the matter is now before the court.[2]

## Summary Judgment Principles

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

 "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is

---

[2] On January 14, 2013, Plaintiff filed an Opposition to Defendant's motion for summary judgment. [doc. # 46]. Plaintiff's Opposition was marked as deficient for failure to include a statement of material facts pursuant to LR 56.2. [doc. # 47]. The deficiency went uncured, and the opposition was then stricken. However, the Court notes that even if it were to consider Plaintiff's opposition [doc. # 46] it would not alter its findings herein.

appropriate. *Id*.

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible, and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. "The court *need* consider only the cited materials, but it *may* consider other materials in the record." Fed.R.Civ.P. 56(c)(3) (emphasis added). While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). There can be no genuine issue as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23. This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

When a movant bears the burden of proof on an issue, it must establish "beyond peradventure[3] all of the essential elements of the claim . . . to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). In other words, the movant must affirmatively establish its right to prevail as a matter of law. *Universal Sav. Ass'n v. McConnell*, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

## **Relevant Facts**

### A.      **The Group Insurance Policy**

Continental Casualty Company issued Group Policy Number SR-83111665 (a/k/a the "Plan" or "Policy") to Kilpatrick Life Insurance Co. ("Kilpatrick"), which provided Kilpatrick's

---

[3]  *I.e.*, beyond doubt.

employees with long term disability insurance coverage.[4]  Through her employment as a debit

insurance agent at Kilpatrick, Plaintiff Philen was a participant under the Policy.

(HART/PHILEN00012).  Hartford administers claims under the Plan and pays those claims from

its own funds.  [doc. # 1, P. 2].

Relevant Plan provisions include,

**HOW DO WE DEFINE DISABILITY?**

*Disability* or *Disabled* means that *You* satisfy the Occupation Qualifier or the
Earnings Qualifier as defined below.

**Occupation Qualifier**

*"Disability"* means that during the *Elimination Period* and the following 24
months, *Injury* or *Sickness* causes physical or mental impairment to such a
degree of severity that *You* are:
    1.    continuously unable to perform the *Material and Substantial Duties
of Your Regular Occupation*; and
    2.    Not working for wages in any occupation for which *You* are or
become qualified by education, training or experience and which
provides *You* with substantially the same earning capacity as *Your*
former earning capacity prior to the start of *Your Disability*.

After the *Monthly Benefit* has been payable for 24 months, *"Disability"* means that
*Injury* or *Sickness* causes physical or mental impairment to such a degree of severity
that *You* are:
    1.    continuously unable to engage in any occupation for which *You* are
or become qualified by education, training or experience; and
    2.    not working for wages in any occupation for which *You* are or
become qualified by education, training or experience and which
provides *You* with substantially the same earning capacity as *Your*
former earning capacity prior to the start of *Your Disability*.

*        *        *

---

[4]  The administrative record is filed in the court record as document # 20, and Bates
labeled "HART/PHILEN00001-HART/PHILEN00565."  A copy of the Plan is numbered
HART/PHILEN00001-HART/PHILEN00026.  Hereinafter, citations to the administrative record
will be limited to the applicable Bates Number(s) for each cited document.

**WHAT IS THE *ELIMINATION PERIOD* AND HOW IS IT SATISFIED?**

The *Elimination Period* beings on the day *You* become *Disabled*. It is a period of continuos *Disability* which must be satisfied before *You* are eligible to receive benefits from *Us*. *You* must be continuously *Disabled* through *Your Elimination Period*.

If *You* temporarily recover and return to work, *We* will treat *Your Disability* as continuous if *You* return to work for a period of less than one-half the *Elimination Period* as shown in the *Summary of Benefits* not to exceed 90 days. The days that *You* are not *Disabled* will not count toward *Your Elimination Period*.

Any increases *You* receive in *Monthly Earnings* during *Your* return to work period will not be taken into consideration when calculating *Your Monthly Benefit*.

If *You* return to work for a period greater than one-half the *Elimination Period*, or 90 days, whichever is less, and become *Disabled* again, *You* will have to begin a new *Elimination Period*.

*      *      *

**Proof of Disability**

The following items, supplied at *Your* expense, must be a part of *Your* proof of loss. Failure to do so may delay, suspend or terminate *Your* benefits:

1. The date of *Your Disability* began;
2. The case of *Your Disability*;
3. The prognosis of *Your Disability*;
4. Proof that *You* are receiving *Appropriate and Regular Care* for *Your* condition from a *Doctor*, who is someone other than *You* or a member of *Your immediate family*, whose specialty or expertise is the most appropriate for *Your* disabling condition(s) according to *Generally Accepted Medical Practice*.
5. Objective medical findings which support *Your Disability*, Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for *Your* disabling condition(s).
6. The extent of *Your Disability*, including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation*.
7. Appropriate documentation of *Your Monthly Earnings*. If applicable, appropriate, regular monthly documentation of *Your Disability Earnings*.
8. If *You* were contributing to the premium cost, *Your* employer must supply proof of *Your* appropriate payroll deductions.
9. The name and address of any *Hospital or Health Care Facility* where *You* have been treated for *Your Disability*.
10. If applicable, proof of incurred costs covered under other benefits included in the policy.

5

**Continuing Proof of *Disability***

*You* may be asked to submit proof that *You* continue to be *Disabled* and are continuing to receive *Appropriate and Regular Care* of a *Doctor*. Requests of this nature will only be as often as *We* feel reasonably necessary. If so, this will be at *Your* expense and must be received within 30 days of *Our* request.

*          *          *

***"Appropriate and Regular Care"*** means that *You* are regularly visiting a *Doctor* as frequently as medically required to meet *Your* basic health needs.  The effect of the care should be of demonstrable medical value for *Your* disabling condition(s) to effectively attain and/or maintain *Maximum Medical Improvement.*

(HART/PHILEN00015; 00016; 00022; 00025).

Thus, under the foregoing plan terms, a claimant must be continuously "disabled" for a 90-day "Elimination Period" before disability benefits become payable.  (HART/PHILEN00016).

After a claimant has received 24 months of long-term disability ("LTD") benefits, the definition of "disabled" under the Plan becomes more restrictive.  The first 24 months of LTD benefits are payable under the Plan if the claimant provides satisfactory proof that she is disabled from performing the material duties of her regular occupation (commonly referred to as the "Own Occupation Period").  Thereafter, the claimant will be "disabled" and, thus, entitled to continue to receive LTD benefits, only if she is unable to perform the material duties of any occupation for which she may reasonably become qualified (commonly referred to as the "Any Occupation Period").

**B.     Solely the "Any Occupation Period" is at Issue at this Time**

Philen alleges disability as of December 30, 2003.  (HART/PHILEN00096).  Thus, Plaintiff's "benefit start date" following the 90 day "Elimination Period" was March 29, 2004.  Thus, the "Own Occupation" period for the instant claim extended through March 29, 2006.

Hartford paid benefits until termination on December 13, 2007, which is well into the Any Occupation Period.[5]  (HART/PHILEN00318-00323).

C.    **Factual and Procedural Background**

1.    ***Plaintiff's claim***

On December 30, 2003, Philen submitted a claim for LTD benefits. (HART/PHILEN00552).  Plaintiff condition was described as "Lumbar HNP." *Id.* at 554.  She indicated that her primary physician was Dr. Marcos A. Ramos.  *Id.* at 552.

Additionally, Plaintiff submitted medical records from Drs. Ramos and James T. Hill to support her claim. Dr. Ramos' notes from July 24, 2003, indicate that Plaintiff complained of "persistent lower back pain radiated to both sides in the groin area." *Id.* at 555.  He noted that her pain was in connection with "previous surgical treatment for persistent low back pain." Moreover, after reviewing an MRI of the lumbosacral spine, he stated that it shows "recurrent herniated nucleus pulposus at the level of L5-S1 . . . [and] C5-C6." *Id.*  Ultimately, Dr. Ramos found that Plaintiff has limitation to her range of motion and has "manifestations of cervical radiculopathy as well as lumbosacral and lumbar radiculopathy." *Id.* at 556.

On September 22, 2003, Dr. Ramos examined Plaintiff again, noting that her pain is getting worse. *Id.* at 557.  Moreover, he noted further limitation to Plaintiff's range of motion, "especially to hyperextentions and lateralization toward the right." *Id.*   Dr. Ramos opined that

---

[5] Philen was a "Sales Agent" for Kilpatrick.  According to the administrative record, Sales Agents were responsible for "[s]olicit[ing] insurance applications for the Company for the kinds and classes of risks and plans designated by the company away from the company office requiring time spent in an automobile.  Normal hours spent in sales activity per week is eighteen (18) hours which includes traveling in an automobile."  (HART/PHILEN00495).  Furthermore, "Sales and Service Activities require some porch, step, and stairway climbing and getting in and out of an automobile an average of 150 times a week . . ." *Id.*

the MRI of the cervical spine "shows pathology manifested by herniated nucleus pulposus and extradural defect at the level of C5-C6" and the MRI of the lumbosacral spine shows "herniated nucleus pulposus at L5-S1." *Id.*  Plaintiff returned to Dr. Ramos' office on September 29, 2003, complaining of "excruciating low back pain." *Id.* at 558.  Dr. Ramos noted that Plaintiff is unable to "stand or sit because of the severity of the symptoms." *Id.*   Accordingly, a surgery was scheduled for October 3, 2003, in which a Total Lumbar Laminectomy L5, Micro Diskectomy at L4-5 and Micro Diskectomy recurrent herniated nucleus pulposus L5-S1 on the right was performed by Dr. Ramos. *Id.* at 559.   The record reveals that Plaintiff had an "uneventful recovery" and she continued to improve. *Id.* at 561-62.  However, on February 5, 2004, Plaintiff came to Dr. Ramos' office complaining that "she continues to have neck pain radiated to both shoulders and both upper extremities" and "low back pain radiated to both lower extremities." *Id*. at 545.  Thereafter, on February 19, 2004, Dr. Ramos submitted a Functional Assessment Tool, noting that Plaintiff was not released to return back to work and gave April 3, 2004, as the date he tentatively expected Plaintiff to return to work. *Id.* at 544.  Based on Dr. Ramos' report, Continental Casualty Company ("CCC") approved Plaintiff's claim through April 2, 2004. *Id.* at 100.

After being approved for benefits, Plaintiff began seeing Dr. Hill for regular treatment for lumbar disc disease and post-operative cervical disc disease.  On April 14, 2004, Dr Hill opined that Plaintiff is "totally disabled from her work" and she "has significant pain which emanates from the cervical spine" causing her to "sleep no more than 2 hours at a time." *Id.* at 529.  In an April 14, 2004, "To Whom it May Concern letter", Dr. Hill stated "Mrs. Philen suffers from cervical disc disease and post-operative (x2) lumbar disc disease and is permanently and irreversibly disabled.  There will be no improvement in the future." *Id.* at 535.  This time, CCC

8

approved Plaintiff's claim until June 2, 2004.  *Id.* at 94.  On June 3, 2004, Dr. Hill completed a

Functional Assessment Tool, in which he noted that Plaintiff is not capable of "performing full

time work . . . [,]she cannot even perform housework."  *Id.* at 523.  Again, on June 9, 2004, Dr.

Hill noted that Plaintiff suffers a "great deal of pain" and is unable to complete "even light

housework."  Dr. Hill also stated that "[p]hysical therapy was entertained, but the physical

therapist assured [Philen] there was nothing that could be done."  *Id.* at 519.

### 2.     *Plaintiff's claim for Social Security Benefits and continued disability*

The administrative record reveals that around June 2004, Hartford assumed the

administration of Plaintiff's claim from CCC, and it began to assist Plaintiff with filing a claim

for Social Security Disability benefits with the Social Security Administration.  *Id.* at 95.

Specifically, on June 3, 2004, the record reveals that Plaintiff "returned authorization [to

Hartford] for Allsup to represent her" in filling a claim with SSA.  *Id.*  Thereafter, on July 20,

2004, Hartford filed an application "on claimant's behalf."  *Id.* at 93.

At this point, Plaintiff continued to receive regular monthly treatment from Dr. Hill.  On

August 30, 2004, Dr. Hill noted that Plaintiff is incapable of performing full time work that

"involves sitting and getting into and out of an automobile an average of 150 times per week,

walking, and some stairway climbing."  *Id.* at 521.  On August 31, 2004, Hartford requested that

Dr. Hill provide Plaintiff's "specific abilities or limitations as well as their duration."  *Id.* at 515.

In response, Dr. Hill handwrote: "can't even perform activities of daily living consistently;" "no

lift, band, sleep, no fixed position > 15' without a break to be allowed to lie down;" and "this

lady lives in a world of relentless pain."  *Id.* at 515.

The administrative record reveals that after August 30, 2004, Plaintiff discontinued her

visits to Dr. Hill for monthly treatment.  Accordingly, on January 19, 2005, Hartford referred

Plaintiff's claim to their Special Investigation Unit for Investigation, noting in the referral:

> Claimant is a 41 year old female employed as an Insurance Sales Agent w/ dx of L-HNP.  Claimant states she is not able to perform ADL's and does not leave her house d/t [do to] pain.  Dr. Hill is only AP and he stated claimant "lives in a world of relentless pain" and can't even perform ADL'S.
>
> Claimants restrictions are excessive based on medical in file.

*Id.* at 487.[6]   Thereafter, on April 22, 2005, Dr. Hill's physical examination revealed "significant dorsal spasticity, lumbar and cervical spasticity, but equal grip strength and symmetrical bilateral reflexes."  *Id.* at 467.  Furthermore, he continued to give the diagnoses of cervical and lumbar disc disease and also diagnosed Plaintiff with regional myofascial pain syndrome of the dorsal spine.  *Id.*

On April 25, 2005, Plaintiff visited Dr. Ramos' office with complaints of "intense neck pain radiated to the right shoulder and right upper extremity . . ."  *Id.* at 461.  During Dr. Ramos' physical examination, he found "limitation to range of motion . . . patient is not able to ambulate either on tip toes or his [*sic*] heels because of pain."  *Id.*  Accordingly, Dr. Ramos requested an MRI of the cervical and thoracic and lumboscral spine.  *Id.*  The MRI showed "[s]pondylosis cervical spine with mild cord impingement C5-6 and C6-7 levels," "[d]egenerative bony and disc disease L4-S1," and the "[d]isease and stenosis increased since the previous exam."  *Id.* at 484-86.  Based on the MRI, Dr. Ramos recommended several surgical operations be performed, including an "[a]nterior cervical diskectomy/corpectomy/fusion C5, C6, & C7;" and "Lumbar laminectomy for foramina stenosis on the left L4-5, and on the right L5-S1."  However, there is no evidence in the administrative record that these surgeries were ever performed.

---

[6]  According to the administrative record, this investigation was closed on March 7, 2005, the adjuster noted "SIU completed its investigation and has been unable to identify any evidence that reasonably suggests fraudulent activity."  *Id.* at 82.

On June 6, 2005, Dr. Hill referred Plaintiff to Dr. David Cavanaugh for treatment of her lumbar disc disease.  *Id.* at 464.  Dr.  Hill completed another Functional Assessment Tool on July 22, 2005, noting that Plaintiff is unable to perform full time work, and accordingly, Hartford continued to pay benefits.  *Id.* at 65-75.

Thereafter, on February 27, 2006, Plaintiff informed Hartford that "social security has been approved and she received a deposit into her checking account in the amount of [approximately] $23,400."  *Id.* at 72.   On April 19, 2006, Hartford wrote to Plaintiff explaining that, pursuant to the Plan terms[7], a portion of her social security benefits would be used as an offset to the long term disability benefits that she received for the past three years.  *Id.* at 136.

### 3. *Plaintiff enters the Any Occupation Period*.

In June 2006, Plaintiff no longer qualified for disability based on her inability to perform her own occupation, but rather, needed to meet the requirements of the Any Occupation Definition of Disability.  Accordingly, on June 14, 2006, Hartford wrote to Plaintiff explaining the distinctions between the two disability definitions and their respective periods, and further, the initiation of "an investigation to determine if [Plaintiff] continue[d] to qualify for benefits." *Id.* at 446.  The letter also requested that, within 21 days, Plaintiff return an "Attending Physician Statement," and that the physician provide copies of "office/progress notes, diagnostic test results, consultation reports, etc. from 7/2005 through present."  *Id.*

According to the administrative record, Plaintiff began seeing Dr. Kathleen Majors, who completed the attending Physician's Statement of Disability on September 14, 2006.  *Id.* at 439.

---

[7] Under the Plan, in pertinent part: "The *Monthly Benefit* under this policy shall be reduced by: (1) Disability benefits paid, payable, or for which there is a right under: (a) The Social Security Act, including any amounts for which *Your* dependents may qualify because of *Your Disability*. . ."  *Id.* at 17.

According to Dr. Majors, Plaintiff's primary diagnosis was post laminectomy pain syndrome and her secondary diagnosis was degenerative disc disease of the lumbar spine. *Id.* Moreover, Dr. Majors noted that Plaintiff is still "unable to work," without giving any specific details. *Id.* at 440. Accordingly, Hartford determined that Plaintiff met the definition of Any Occupation Disability, and continued to pay her LTD benefits. *Id.* at 66.

### 3. *Hartford's Termination of LTD benefits.*

Approximately a year later, on August 8, 2007, Hartford again requested updated information from Plaintiff to support her claim for LTD benefits. *Id.* at 132. Specifically, Hartford requested: (1) Authorization to Disclose Health Information Form; (2) Claimant Questionnaire; (3) Pension Questionnaire; (4) Work & Education History Form; and, (5) an Attending Physician Statement. *Id.* Plaintiff complied with Hartford's requests with the exception of returning the Attending Physician Statement. *See id.* at 411. Instead, Plaintiff submitted a handwritten letter dated September 10, 2007, indicating that she is "in the process of trying to find a new physician and cannot get the physician's statement filled out at this time." *Id.* at 398. However, the record reveals that months passed without Plaintiff's response. Accordingly, Hartford wrote to Plaintiff on September 19, 2007, October 12, 2007, and November 14, 2007, informing her that it requested copies of her medical records from Drs. Majors and Patton. *Id.* at 392, 353, 333. Additionally, in the November 14, 2007, letter, Hartford indicated that "[t]his will be our last request for the information needed to decide [Plaintiff's] LTD claim . . . [t]his lack of Proof of Loss may result in termination of your claim." *Id*. at 333. Plaintiff was again given 21 days to provide the Attending Physician's Statement. *Id.*

On September 24, 2007, Dr. Majors' office responded to Hartford's requests and provided Plaintiff's medical records. *Id.* at 360. Based on the provided records, Plaintiff was not

12

seen by Dr. Majors from September 2006 to June 2007.  *See id.* at 367-74.   On June 6, 2007, Dr.

Majors examined Plaintiff and noted: "She is doing better than on her last evaluation.  She is

doing quite well with her pain medications.  She still has pain in her back that radiates down into

her legs, and she has neck pain, but overall, she is able to do activities of daily living and take

care of her children."  *Id.* at 349.  Thereafter, Plaintiff was again examined on July 11, 2007.

According to Dr. Majors' physician notes, Plaintiff used two old Lortab pills while she was at her

mother's home and there were at least 33 Roxicodone pills and 3.5 Methadone pills missing.  *Id.*

at 363.  Additionally, Plaintiff's toxicology report dated July 5, 2007, reveals that she tested

positive for Propoxyphene, and according to the report, "there is no propoxyphene prescription

listed" for Plaintiff.  *Id.* at 378, 380.  Dr. Majors noted that Plaintiff violated her pain medication

contracts, and ultimately planned to wean her from her medication and discontinue treatment.  *Id.*

at 363.

  According to the medical records dated July 24, 2007, provided to Hartford by Dr. Patton,

Plaintiff fell "out of care from our office. I saw her in September of 2006. She was supposed to

return for complete physical examination after a couple of weeks. She has not returned since

then."  *Id.* at 326.  Moreover, Dr. Patton notes that Plaintiff was "in no acute distress," and has

pain in her lower back and cervical disc disorder.  *Id.* at 325.  Plaintiff was referred to Drs.

Posner and Brewer for treatment for "her chronic low back and cervical disc related pain."  *Id.*

However, there is no evidence in the administrative record that Plaintiff sought treatment from

either of these two doctors.

  Ultimately, on December 13, 2007, Hartford terminated Plaintiff's LTD for failure "to

provide proof of [her] ongoing Disability."  *Id.* at 318.  Specifically, in the termination, Hartford

based its decision to termination on: (1) the Policy; (2) the Attending Physician's Statement

13

signed by Dr. Majors on September 14, 2006; (3) Plaintiff's Claimant Questionnaire dated

August 18, 2007; (4) Plaintiff's note dated September 10, 2007; (5) two telephone interviews

with Plaintiff on October 1, 2007, and November 26, 2007; and, (6) office notes and medical

records from Drs. Majors and Patton.  *Id.* at 320.  Hartford's letter explained that under the terms

of the Policy, Plaintiff "must receive appropriate and regular care for [her] disabling condition

from a doctor whose specialty or expertise is the most appropriate for [her] disabling condition."

*Id.*  Hartford points to Dr. Patton's medical records that state Plaintiff had "fallen out of care

from their office."  *Id.* at 321.  Moreover, according to the termination letter, Plaintiff stated in

the November 26, 2007, telephone interview that she was still "trying to find a new physician."

*Id.* Additionally, Hartford indicates that it still has "not yet received the Attending Physician

Statement," which was requested on August 8, 2007.  *Id.*  Hartford's letter concludes by stating

"[t]he lack of medical information hindered our ability to determine whether you continue to

satisfy the provisions of the LTD policy beyond 12/13/07," and "[b]ecause of this, [Plaintiff's]

LTD benefits must be terminated beyond 12/13/07."  *Id.*

Although Hartford terminated Plaintiff's LTD benefits, it did give her the opportunity to

perfect her claim "by providing the necessary information" or in the alternative, a chance to

appeal Hartford's decision.  *Id.*  Specifically, Hartford instructed Plaintiff to provide "a

completed Attending Physician's Statement of Continued Disability from a physician certifying

[her] continuing Total Disability."  *Id.* at 322.

### 4.  *Plaintiff's post-termination treatment & Hartford's review of LTD benefits termination*

On February 6, 2008, Dr. Neil Halim completed Hartford's required Attending

Physician's Statement of Continued Disability.  *Id.* at 314.   Dr. Halim's primary diagnosis was

poorly controlled Hypertension, and secondary diagnosis was chronic back pain.  *Id.*  Dr.

Halim's opined that these are "chronic; lifelong conditions;" however, stated that Plaintiff can

participate in vocational rehabilitation services "as long as it does not involve using back muscles

and not in one position for great lengths of time less than 1 [hour]."  *Id.* at 315.  Additionally, Dr.

Halim noted that Plaintiff is able to sit less than an hour at a time, less than an hour a day, stand

less than an hour at a time, less than an hour a day, and walk less than an hour at a time, less than

an hour a day in a general workplace environment.  *Id.*  Finally, Dr. Halim found that Plaintiff is

(1) never able to lift/carry anything that weighs at least one pound, bend at the waist,

kneel/crouch, reach above her shoulder or below her waist/desk, and (2) can only occasionally[8]

drive and reach at her waist/desk level.  *Id.*

Following receipt of Dr. Halim's Attending Physician's Statement of Continued

Disability, on May 7, 2008,  Hartford instructed Plaintiff to undergo an evaluation by Dr. Gordon

Mead, an orthopedist, in order to "assist [Hartford] in evaluating [Plaintiff's] continued eligibility

for LTD benefits."  *Id.* at 309.   Accordingly, on June 2, 2008, Dr. Mead opined on his evaluation

of Plaintiff, stating:

> In general, she appears to be rather flat in affect and gives me the impression of being
> depressed during her exam. She also seemed to somewhat exaggerate her in ability
> [*sic*] to get around such as moving around the examining room and getting up and
> down on the table.
>
> *            *            *
>
> Examination of this lady's neck was performed with her sitting on the examining
> table, she had tenderness to palpation of the paracervical area. No evidence of spasm.
> She had about 50% normal range of motion in all directions accompanied by
> complaints of pain. She was very slow and deliberate in her motions. Reflexes and
> strength in upper extremities were intact. She had no decreased sensation of the

---

[8]  Defined as "1-33%" of a day.  *Id.*

fingers, negative Tinel over the median nerve.

*      *      *

MRI of the lumbar spine on 3-1-04 showed evidence of degenerative disk disease at L4-5 and L5-S1 with lateral disk protrusion at L4-5 on the left, and L5-S1 on the right.  MRI of the lumbar spine on 5-10-05 was read as showing degenerative disk disease at L4-5 and L5-S1 with foraminal stenosis. MRI of the thoracic spine on 5-5-05 showed disk space narrowing and no evidence of central or lateral stenosis. MRI of the cervical spine without contrast on 5-5-05 showed spondylosis of the cervical spine with mild cord impingement at C5-6 and C6-7 levels.

*      *      *

It is my impression that Ms. Philen does have degenerative cervical and lumbar disk disease. The pain that she expresses is out of proportion to objective findings. From an orthopedic standpoint, this lady should be able to work at light duty activities. She should have limitations of repeated bending or any lifting greater than 10 pounds. She would have to be able to get up and walk around periodically after sitting for periods of time.  She should not be expected to stand or walk all day long. She should be able, in an 8-hour day, to spend 2 hours standing and 4 hours walking and 4 hours sitting in intermittent fashion with rest periods every 2 hours. In an 8-hour day, she should be able to use her upper extremities freely in a frequent capacity for keyboarding and driving.  The degenerative disease is permanent and the restrictions as I have outlined would be permanent.

*Id.* at 304.

On June 17, 2008, Hartford provided Dr. Halim a copy of Dr. Mead's Independent Medical Examination and asked him to review the IME report and answer: "Do you agree with the IME findings of Dr. Mead?"  *Id.* at 295.  Additionally, if Dr. Halim disagreed with Dr. Mead's findings, then Hartford asked him to "provide [his] rationale," "be as specific as possible and describe the patient's present condition(s) and how it prevents her from working full-time," and "include any specific test results, diagnostic studies, or clinic examination findings you have on file." *Id.*  Dr. Halim failed to respond according to Hartford's instruction, and instead, handwrote: "Will let medical records on file be used & information from other physicians <u>combined</u>." *Id.* (emphasis in original).

16

On August 12, 2008, Marvin S. Bryant, a Vocational Rehabilitation Counselor, performed an Employability Analysis Report ("EAR") in order to determine whether there were any occupations within the local economy ("Shreveport-Bossier") available for Plaintiff, accounting for her functional limitations, education, training, and work history. *Id.* at 246. Specifically, under *"Functional Capacity,"* Mr. Bryant summarized the above-mentioned limitations noted by Dr. Mead is his IME. *Id.* Moreover, under "Education, training, and work history," Mr. Bryant stated that Plaintiff has a GED, "there is no mention of her attending trade school or college," and she has been a Sales Insurance Agent for six years and a Secretary for three years. *Id.* In his analysis, Mr. Bryant used Occupational Access System ("OASYS"), which is "a computerized job matching system that cross references an individual's qualifications profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles . . . [to] assess employability." Accordingly, OASYS was adjusted to reflect Plaintiff's "Functional Capacity" and "Education, training, and work history." *Id.* Mr. Bryant's report identified seven occupations that "are sedentary in physical demands, are prevalent in the national and local economy and would meet and/or exceed the required earnings potential of $9.26/hour," as: (1) Secretary, (2) Policyholder-Information Clerk, (3) Customer Service Representative, (4) Receptionist, (5) Information Clerk, (6) Appointment Clerk, (7) Surveillance System Monitor. *Id.* at 247.

Ultimately, on September 9, 2008, Hartford wrote to Plaintiff to advise that it had completed its review of her LTD claim. Hartford "determined that [she did] not meet the policy definition of Disability as of 12/13/07." *Id.* at 241. Hartford stated that it based its decision on

17

the Plan terms, all of Plaintiff's treating physicians,[9] a telephone interview with Plaintiff on

October 1, 2007, a Claimant Questionnaire completed by Plaintiff on August 18, 2007, the

Employability Analysis Report completed by Mr. Bryant, and Plaintiff's Work and Education

History form completed on August 18, 2007.  *Id.*  Specifically, Hartford found that it "received

no medical records with Dr. Halim's statement to support the restrictions he provided," and

therefore, referred her to Dr. Mead for further consideration of the LTD benefits claim.  *Id.* at

243.  Hartford stated that "Dr. Mead examined [Plaintiff] and reviewed [her] medical records,"

and he concluded that Plaintiff was "capable of performing a full-time light duty activities."  *Id.*

at 244.  Thereafter, Hartford explained Mr. Bryant's findings in the Employment Analysis report,

stating that the report "identified 7 gainful sedentary occupations that [Plaintiff is] qualified to

perform."  *Id.*  Hartford concludes that Plaintiff was "not prevented from performing the essential

duties of Any Occupation as required by your Long Term Disability policy," and therefore, her

LTD benefits remained terminated.  *Id.* at 244.

### 5.    *Plaintiff's first level appeal*

By letter dated February 1, 2009, received by Hartford on March 2, 2009, Plaintiff

appealed Hartford's termination.  *Id.* at 231.  In her letter, she explained her (1) delay in finding a

treating physician, (2) violation of Dr. Majors' pain management contract, (3) disagreement with

Dr. Mead's findings, and (4) general medical and emotional problems.  *Id.* at 231-34.

Additionally, she submitted two MRIs with her formal appeal –  an MRI of (1) the cervical spine

without contrast performed on September 29, 2008, and (2) the lumbar spine performed on

November 14, 2008.  *See id.* at 218-19.  The MRI of the lumbar spine showed "degenerative

---

[9]  As of September 9, 2008, Plaintiff's treating physicians include Drs. Majors, Ramos, Patton, Hill, and Halim.

bony and disc disease at C5-7 with posterior bony bar formation at C5-6." *Id.* at 218.  Dr. Don

Holton opined that the "Degenerative disease with bony spurring [is] causing significant

foraminal stenosis on the right C5-6." *Id.*   The MRI of the lumbar spine showed

> disc bulging causing mild impingement of the thecal sac. At L2-3 level, there is disc
> bulging with mild focal left lateral disc protrusion causing mild impingement of
> thecal sac and mild left neural foraminal stenosis. At L4-5 level, there is disc bulging
> with mild posterior central disc protrusion or extrusion as well as facet hypertrophy
> causing mild impingement of the thecal sac with moderate bilateral neural foraminal
> stenosis. At L5-S1 level, there is disc bulging with mild posterior central and right
> paramedial disc extrusion with inferior migration of fragments to the superior aspect
> of S-1 vertebral body as well as facet hypertrophy causing impingement of the right
> S-1 nerve root and mild right neural foraminal stenosis. There is some enhancement
> of the epidural space at L4-5 and L5-S1 levels consistent with post surgical scarring.
> No fracture or subluxation is seen.

*Id.* at 219.

In response to these two MRIs, Hartford requested additional information from Plaintiff,

including "opinions from doctors regarding her level of functionality." *Id.* at 37.  Plaintiff

indicated that she would contact her treating physicians "to see if they'll fax something" to

Hartford.  *Id.*  The record reveals that Hartford followed up several times with Plaintiff, giving

her additional time to supplement her medical records for the appeal; however, Plaintiff failed to

provide additional information and, in fact, stated that "she appreciates the [additional] time that

has been granted . . . [Hartford] can consider [the] appeal complete and proceed with appeal

review." *Id.* at 35.

On June 24, 2009, Plaintiff's claim was then sent to Reliable Review Services, where it

was reviewed by Dr. Charles Brock, an independent physician consultant who is a Board

Certified Neurologist.  *Id.* at 204.  After reviewing Plaintiff's clinical history and medical

records, Dr. Brock opined that "the available medical records indicate degeneration of the lumbar

spine with previous surgery as well as degeneration of the cervical spine." *Id.* at 208.

19

Additionally, Dr. Brock noted that "[t]hese signs would be consistent with the reduced ability to lift, push, pull, carry but otherwise the available medical records do not indicate specific evidence of objective neurologic deficits in terms of motor sensory, reflex, cranial nerve or cognitive function." *Id.*  However, Dr. Brock's opinion as to Plaintiff's functional ability was limited as "[t]he available medicals records do not contain a formal Functional Capacity Evaluation which would help provide an evaluation of the claimant's abilities along with validity measures to help determine what restrictions and limitations would or would not be supported." *Id.*  Finally, Dr. Brock Attempted to contact Dr. Halim and left messages on June 18, 19, and 22, 2009; however, his messages went unreturned.  *Id.* at 206.

On July 7, 2009, Hartford issued a letter to Plaintiff advising her that it had upheld its prior decision to terminate Plaintiff's LTD benefits.  *Id.* at 201.  Hartford stated that it reviewed all the documents contained in Plaintiff's claim file, and in particular Plaintiff's February 1, 2009 letter, her two recent MRIs, and the opinion of Dr. Brock.  *Id.*  Hartford explained:

> while Dr. Halim supports your inability to work, he did not call Dr. Brock back to discuss your case. Dr. Brock opined that you have the ability to lift, push, pull, carry but otherwise the available medical records do not indicate specific evidence of measurable neurologic deficits in terms of motor sensory, reflex, cranial nerve or cognitive function.  From a neurology perspective the restriction of not lifting, pushing, pulling, carrying greater than 10 pounds on a recurrent basis would be recommended with no extremes of lumbar flexion, extension or side bending.  The IME report completed by Dr. Mead provided the orthopedic opinion that you should be able to work at light duty activities.  An Employability Analysis Report identified alternative, transferable sedentary level occupations that meet Policy requirements.

*Id.* at 202.  Hartford concluded that the preponderance of the evidence supports Plaintiff's ability to perform duties of any occupation.  *Id.*

### 6. *Post Appeal*

On September 5, 2011, Plaintiff initiated the instant suit against Hartford, seeking (1) a

declaratory judgment declaring Plaintiff's entitlement to disability insurance benefits, (2) an award in the amount of all past due benefits, (3) injunctive relief ordering the payment of future benefits for as long as Plaintiff remains disabled, (4) an equitable surcharge on such benefits for the losses sustained by Plaintiff resulting from withholding of her benefits, (5) penalties for the failure and refusal to produce documents requested, and (6) attorney's fees and interest.  [doc. # 1, P. 1].  As stated *supra*, on May 17, 2012, Plaintiff filed a Motion for Summary Judgment, seeking to establish the standard of review as *de novo*. [doc. # 12].   On September 5, 2012, the undersigned issued a Report and Recommendation, adopted by the District Court on October 23, 2012, denying Plaintiff's motion and finding that "Hartford's determination that Philen was not disabled is a factual determination that is subject to review for abuse of discretion, with the court weighing any conflict of interest (if established by the employee) as a factor in the analysis." [doc. # 28, P. 8].   The parties then filed cross-motions for Summary Judgment, thereby submitting the matter for decision in the context of cross-motions for summary judgment.  *See* [docs. # 35, 42].  After delay for briefing, the matter is before the Court.

## Analysis

"ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans' and 'to protect contractually defined benefits.'" *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 393 (5th Cir. 1998) (citation omitted).  To achieve these goals, ERISA requires every employee welfare benefit plan to,

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate

named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

When deciding whether to pay or deny benefits, a plan administrator must make two general types of determinations: "[f]irst, [s]he must determine the facts underlying the claim for benefits . . . [s]econd, [s]he must then determine whether those facts constitute a claim to be honored under the *terms* of the plan." *Schadler*, 147 F.3d at 394 (citation omitted) (emphasis in original). If a plan participant has been denied benefits, then ERISA permits a claimant to bring suit in federal court "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B).

Under ERISA, the factual determinations made by the plan administrator or fiduciary are reviewed for abuse of discretion. *Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 100-101 (5th Cir. 1993) (citing *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552 (5th Cir.1991)). However, a plan administrator's interpretation or application of the plan is reviewed *de novo* "'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Aboul-Fetouh v. Employee Benefits Committee*, 245 F.3d 465, 471-472 (5th Cir. 2001) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 956-57 (1989)).

As stated *supra,* this Court previously determined herein that Hartford's "determination that Philen was not disabled is a factual determination that is subject to review for abuse of discretion." [doc. # 28, P. 8].

Abuse of discretion is synonymous with the arbitrary and capricious standard of review. *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 651-652 (5th Cir. 2009) (citation omitted). "When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, we

affirm an administrator's decision if it is supported by substantial evidence." *Id*.  Further,

> [s]ubstantial evidence is more than a scintilla, less than a preponderance, and is
> such relevant evidence as a reasonable mind might accept as adequate to support a
> conclusion.  An arbitrary decision is one made without a rational connection
> between the known facts and the decision or between the found facts and the
> evidence.

*Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) (internal quotation

marks and citations omitted).  The court's "review of the administrator's decision need not be

particularly complex or technical; it need only assure that the administrator's decision fall

somewhere on a continuum of reasonableness-even if on the low end." *Holland v. Int'l Paper*

*Co. Ret. Plan*, 576 F.3d 240, 247 (5th Cir. 2009) (citation omitted).

A potential conflict of interest is also a factor in the abuse of discretion inquiry.  *Matney*

*v. Hartford Life & Accident Ins. Co.*, 172 Fed. Appx. 571, 572-73 (5th Cir. 2006).  In this case,

because Hartford insures the Policy and is also solely responsible for making benefits

determinations, there is a potential conflict of interest because Hartford "potentially benefits from

every denied claim."  *Vega v. Nat'l Life Ins. Services, Inc.*, 188 F.3d 287, 295 (5th Cir. 1999) (*en*

*banc*).  Therefore, the Court must apply a "sliding scale standard" in reviewing Hartford's

decision, meaning that the Court must "give less deference to the administrator in proportion to

the administrator's apparent conflict," and should be "less likely to make forgiving inferences

when confronted with a record that arguably does not support the administrator's decision."  *Id.*

at 299; *see also Matney*, 172 Fed. Appx. at 572-73. However, as there is no other evidence of a

conflict other than Hartford's position as the insurer and also as the one determining eligibility

for benefits, the Court will afford Hartford's decision "only a modicum less deference" than it

otherwise would.[10]  *Matney*, 172 Fed. Appx. at 573 (citing *Vega*, 188 F.3d at 301).  "Under this

standard, the basis for [Hartford's] decision must be supported by some concrete evidence in the

administrative record." *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395 (5th Cir. 2006)

(quoting *Vega*, 188 F.3d at 302).

   **a.**  **Hartford did not abuse its discretion in terminating Plaintiff's LTD benefits.**

  As a threshold matter, the Court notes that abuse of discretion is decided on the basis of

information known to the administrator at the time he or she made their decision. *Salley v. E.I*

---

  [10]  Plaintiff argues that "Hartford's failure to Consider [Plaintiff's] favorable SSA award was procedurally unreasonable" thereby empowering this Court to accord more weight to Hartford's structural conflict of interest.  However, Hartford was not required to defer to the SSA's decision and was entitled to reach its own independent conclusion as to Plaintiff's eligibility for disability benefits, as long as that conclusion was based on substantial evidence. *Dubose v. Prudential Ins. Co.*, 85 Fed. Appx. 371, 372 (5th Cir. 2003). The question for this Court is whether there is substantial evidence in the administrative record (which includes, but is certainly not limited to, the SSA decision) to support its decision to terminate Plaintiff's disability benefits. That Hartford reached a different conclusion than the SSA does not mean that its decision was not reasonable. The SSA decision does not establish that Hartford's decision to terminate Plaintiff's benefits was not supported by substantial evidence.  Additionally, in *Schexnayder v. Hartford Life and Accident Ins. Co.*, the Fifth Circuit held that while the administrator is required to address the contrary award, it is not required "to give any particular weight to the contrary findings . . . [the administrator] could have simply acknowledged the award and concluded that, based on the medical evidence before it, the evidence supporting denial is more credible."  600 F.3d 466, 471 n. 3 (5th Cir. 2010).  The court goes on to state that "[it] is the lack of any acknowledgment which leads us to conclude that [the administrator's] decision was procedurally unreasonable and suggests that it failed to consider all relevant evidence." *Id.*

  Moreover, the standards  of review under the SSA rules and ERISA are very different. Under the SSA's rules, once it is found that a claimant cannot perform the duties of his past work due to his physical condition, the burden shifts to the SSA to show that there are other jobs that the claimant can perform. Under ERISA and the Plan, however, claimant has the burden of proving entitlement to benefits.

  The administrative record reveals that Hartford acknowledged, considered and rejected the SSA award in its decision.  Specifically, in a response to Plaintiff's argument regarding her SSA award, Hartford stated "the Social Security Administration and the Hartford use different definitions of disability and different criteria for awarding disability benefits.  A decision by the Hartford to award benefits does not mean that the Social Security Administration will award benefits, and vice versa."  (HART/PHILEN00201).

*DuPont de Nemours & Co.*, 966 F.2d 1011, 1015 (5th Cir. 1992).  Therefore, in applying the

abuse of discretion standard, the Court is limited to the administrative record which "consists of

relevant information made available to the administrator prior to the complainant's filing of a

lawsuit and in a manner that gives the administrator a fair opportunity to consider it."  *Vega*, 188

F.3d at 300; *see also Matney*, 172 Fed. Appx. at 573; *Wildbur v. Arco Chem. Co.*, 974 F.2d 631,

639 (5th Cir. 1992).

Based on a review of the administrative record, as set forth more fully above, the

undersigned concludes that Hartford's decision that Plaintiff was no longer Disabled within the

meaning of the Policy is supported by substantial evidence.  Specifically, Plaintiff's condition

was improving as of June 6, 2007, according to her then treating physician Dr. Majors.

(HART/PHILEN00350).  This assessment was corroborated by Dr. Patton a month later, noting

that Plaintiff was "in no acute distress."  *Id.* at 326.  After violating her pain medication contract

with Dr. Majors, Plaintiff fell out of treatment for a period of seven months.  *See Id.* at 363, 326.

Plaintiff then sought the treatment of Dr. Halim, who stated she was severely disabled; however,

failed to support his position with any updated objective medical evidence, and instead deferred

to Plaintiff's old medical records.  *Id.* at 295.  Because of Dr. Halim's insufficient response,

Hartford justifiably relied on the IME Report of Dr. Mead.  As Hartford properly points out in

brief, "[u]nder ERISA, 'courts have no warrant to require administrators automatically to accord

special weight to opinions of a claimant's physicians; nor may courts impose on plan

administrators a discrete burden of explanation when they credit reliable evidence that conflicts

with a treating physicians evaluation.'"  [doc. #42-1, P. 25] (quoting *Black & Decker Disability*

*Plan v. Nord*, 538 U.S. 822, 834 (2003).  Indeed, numerous courts have upheld administrators'

decisions where the administrator chose to rely upon medical opinions from doctors other than

treating physicians, even from doctors selected by the administrator to review the claim and even where those doctors did not personally examine the claimant. *See, e.g., Chandler v. Hartford Life*, 178 Fed. Appx. 365 (5th Cir. 2006); *Vercher v. Alexander & Alexander, Inc*., 379 F.3d 222, 231-33 (5th Cir. 2004); *Dubose v. Prudential Ins. Co.*, 85 Fed. Appx. 371, 372 (5th Cir. 2003); *Sweatman v. Comm'l Union Ins. Co.*, 39 F.3d 594, 602-03 (5th Cir. 1994); *Noble v. Ingalls Shipbuilding*, 2006 U.S. Dist. LEXIS 21244, 2006 WL 839519, at * 4 (S.D. Miss. Mar. 29, 2006). Ultimately, Dr. Mead determined that Plaintiff "should be able to work at light duty activities" with various limitations listed above.  (HART/PHILEN00295).

Although Dr. Mead is an orthopedist and Plaintiff's condition is arguably outside of his expertise, Hartford also relied on the neurological opinion of Dr. Brock, an independent physician consultant board certified in Neurology.  Dr. Brock stated that "the available medical records do not indicate specific evidence of objective neurologic deficits in terms of motor sensory, reflex, cranial nerve or cognitive function." *Id*. at 208.  However, he could not give an opinion as to Plaintiff's functional ability due to the lack of a formal Functional Capacity Evaluation. *Id.*  To further assess Plaintiff's functional limitations, Dr. Brock attempted to contact Plaintiff's then treating physician Dr. Halim for comment; however, his messages went unreturned. *Id.* at 206.  Additionally, Plaintiff was given numerous occasions to supplement the record up to that point; however, she failed to seize these opportunities and instead stated "[Hartford] can consider [the] appeal complete and proceed with appeal review." *Id.* at 38.

Plaintiff first attempts to analogize the instant case to *Tesch v. Prudential Ins. Co.*, 829 F.Supp.2d 483 (W.D. La. 2011).  Specifically, Plaintiff argues that like the plaintiff in *Tesch*, Plaintiff suffers from "an L4-5 failed back syndrome and L4-S1 herniated discs . . ." [doc. 35-2, P. 21] (citing *Tesch*, 829 F.Supp.2d at 495).  Furthermore, in *Tesch*, the physician chosen by the

insurer to conduct a review of the medical records recommended "[a] more formal functional capacity evaluation [to] provide better documentation of a more realistic physical limitation." *Tesch*, 829 F.Supp.2d at 496.  However, in the present matter, Dr. Brock did not "recommend a more formal functional capacity evaluation," he merely stated that his opinion was limited because of the lack of an FCE, and moreover, the record is clear that he attempted to contact Plaintiff's treating physician, who failed to return his messages, and again, Plaintiff was given the opportunity to supplement the record accordingly.  (HART/PHILEN00205).  Additionally, under the abuse of discretion standard, it is well settled that "there is no justifiable basis for placing the burden solely on the administrator to generate evidence relevant to deciding the claim, which may or may not be available to it, or which may be more readily available to the claimant." *Vega*, 188 F.3d at 298.  Therefore, in the absence of Plaintiff's active cooperation, Hartford was not obligated to generate additional evidence of Plaintiff's functional capacity.

Next, Plaintiff argues that like in *Rucker v. Life Ins. Co. Of North America*, No. 10-3308, 2012 WL 956507 (E.D. La. Mar. 20, 2012) and *Schexnayder v. Hartford Life and Acc. Ins. Co.*, 600 F.3d 465 (5th Cir. 2010), Hartford abused its discretion by "discounting the subjective evidence of Plaintiff's pain and the objective evidence corroborating the disability." [doc. # 35, P. 27].  However, unlike *Rucker* and *Schexnayder*, the administrative record here reveals that Plaintiff began improving, and then fell out of medical care for nearly eight months. Moreover, unlike *Rucker* and *Schexnayder*, Plaintiff's then treating physician's opinion was unsupported by objective medical evidence. When Hartford requested further elaboration and specificity, Dr. Halim failed to meaningfully respond.  (HART/PHILEN00295).  Furthermore, according to Mr. Bryant's EAR, there are at least seven occupations that "are sedentary in physical demands" that Plaintiff was able to perform based on her functional limitations.  *Id.* at 247.

27

The undersigned notes that there is certainly room within the administrative record for a reasonable dispute about Plaintiff's continued disability.  However, it is not for this Court to second-guess Hartford's decision to terminate LTD benefits.  Rather, under the abuse of discretion standard, this Court must defer to Hartford's determination unless it is not supported by substantial evidence.  Based on the administrative record before this Court, the undersigned finds that Hartford did not abuse its discretion and its decision was supported by substantial evidence. Therefore, because Hartford has paid Plaintiff the maximum amount of benefits to which she is entitled under the Policy, the undersigned recommends that Hartford's motion for summary judgment be granted and Plaintiff's complaint is dismissed with prejudice.

## Conclusion

For the above-assigned reasons, the Court finds that there are no genuine issues of material fact and that Defendant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56. Accordingly,

**IT IS RECOMMENDED** that the motion for summary judgment [doc. # 35] and motion for attorney's fees [doc. # 35] filed by Plaintiff Sherry Houck Philen be **DENIED**.[11]

---

[11]  In her motion, Plaintiff seeks attorney's fees.  In *Hardt v. Reliance Standard Life Ins. Co.*, the Supreme Court held that under 29 U.S.C.S. § 1132(g)(1), an ERISA plaintiff need not be a "prevailing party" to be eligible for attorney's fees.  130 S. Ct. 2149, 2156 (2010).  However, the Court did limit the award of attorney's fees to an ERISA plaintiff who can show "some degree of success on the merits."  *Id.* at 2158 (internal citations omitted).  "A claimant does not satisfy that requirement by achieving 'trivial success on the merits' or a 'purely procedural victor[y],' but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'"  *Id.*  Here however, Plaintiff is unable to demonstrate any success on the merits; accordingly, she has failed to establish that she is entitled to attorney's fees.

Defendant requested attorney's fees in its answer; however, did not request fees in its motion for summary judgment.  To the extent it still seeks attorney's fees, Defendant may petition the Court for attorney's fees in accordance with Fed.R.Civ.P. 54, L.R. 54, and the

**IT IS FURTHER RECOMMENDED** that the motion for summary judgment [doc. # 42] filed by Defendant Hartford Life and Accident Insurance Company be **GRANTED** and that judgment be entered in favor of Defendant **DISMISSING** Plaintiff's complaint [doc. # 1] **WITH PREJUDICE.**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 19th day of February 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE

---

Supreme Court's holding in *Hardt*, if appropriate.